# United States Tax Court

T.C. Memo. 2026-28

HANCOCK COUNTY LAND ACQUISITIONS, LLC,
SOUTHEASTERN ARGIVE INVESTMENTS, LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 12385-20.                    Filed March 26, 2026.

———————

*Cenk A. Erkal*, *Megan K. Long*, *Victor M. Fox*, *Joseph M. Kaufman*, *Cassandra S. Bradford*, and *Hale E. Sheppard*, for petitioner.

*Olivia R. Blauert*, *Tess deLiefde*, *Tracie M. Knapp*, and *Sarah M. Raben*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*:  This is a syndicated conservation easement (SCE) case with a familiar fact pattern.  In August 2016 Hancock County Land Acquisitions, LLC (HCLA), granted a conservation easement over a 236-acre parcel of land in rural Mississippi.  This parcel was part of a 1,698-acre tract that had changed hands three times during the previous 13 years for prices as low as $895 and $2,356 per acre.[1]  On its 2016 Form 1065, U.S. Return of Partnership Income, HCLA claimed a charitable contribution deduction for the easement on the theory that the

———————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  We round most monetary amounts to the nearest dollar.

[*2] "before value" of the 236-acre parcel—that is, its value before being encumbered by the easement—was $180,177,000, or $763,462 per acre. That figure was calculated as the discounted cashflow (DCF) that supposedly could be derived from constructing and operating a hypothetical sand and gravel (S&G) mining business on the property.

To its credit, Southeastern Argive Investments, LLC (Argive), petitioner in this case, did not seek to defend that outlandish valuation at trial. Rather, petitioner sought to derive a "before value" for the 236-acre parcel from the amount investors paid to acquire a 97% interest in Argive, or from the amount Argive paid to acquire a 97% interest in HCLA, which owned the land. The "total capital raise" from the investor offering was $23,374,575, and roughly 78% of that amount, or $18,247,575, was paid to the owner of the 236-acre parcel. Petitioner contends that the offering was an arm's-length transaction close in time to—indeed, just six weeks before—the date the easement was granted (valuation date), and that this transaction constitutes the best evidence of the fair market value (FMV) of the land. While not disclaiming a higher value, petitioner contends that the "before value" of the land (making adjustments for minority interests) was at least $18,634,933, or $78,962 per acre.

We reject this argument. The investors were not purchasing land; in substance, they were purchasing tax deductions. Each investor was promised a charitable contribution tax deduction of $7,477 for every $1,000 invested. As a result, the amount they paid for their partnership interests was (roughly speaking) the aggregate amount of the promised tax deduction divided by 7.477. Neither the investors nor Argive negotiated at arm's length over the value of the land; the offering was not priced by reference to the value of the land; and the amount the investors paid had nothing to do with the value of the land. Petitioner produced no credible evidence that the investors expressed any view about what percentage of the offering proceeds should be paid to the landowner under arm's-length standards. We find that the sole focus of their concern was the magnitude of the tax deduction. That number would be the same regardless of how much the landowner was paid for the land.

The trial revealed abundant evidence about sales of land in or near Hancock County during 2012–2016. The land conveyed in many of these sales was actually being mined (or had significant mining potential) and was otherwise comparable to the 236-acre parcel. Most of these transactions occurred at prices ranging from $1,731 per acre to $8,000 per acre. This evidence convinced us that no rational buyer, acting at

[*3] arm's length with reasonable knowledge of the relevant facts, would have paid $78,962 per acre for the 236-acre parcel on August 2, 2016, the valuation date.

Employing the comparable sales method, and giving some weight to a pair of sales that occurred after the valuation date, we find that the "before value" of the 236-acre parcel was $2,360,000, or $10,000 per acre, Subtracting from that figure the "after value" the parties have stipulated ($177,000), we hold that HCLA is entitled to a charitable contribution tax deduction of $2,183,000.

Besides the charitable contribution deduction, HCLA claimed on its 2016 return business expense deductions of $6,128,493, of which about $3.29 million remains in dispute. The largest of these items is an insurance premium of $1,688,944 paid for a "tax loss" policy that insured the investors against the risk that the Internal Revenue Service (IRS) would disallow the deduction claimed for the easement contribution. We hold that this outlay was not an "ordinary and necessary" expense of the partnership under section 162(a). We find that petitioner has likewise failed to substantiate most of the other claimed deductions as legitimate expenses actually incurred in the conduct of HCLA's business.

Finally, we conclude that HCLA is liable for a 40% penalty for gross valuation misstatement with respect to the underpayment of tax attributable to claiming a charitable contribution deduction in excess of $2,183,000. *See* § 6662(a), (h). We hold that HCLA is liable for a 20% accuracy-related penalty with respect to the portion of the underpayment attributable to the other disallowed deductions. *See* § 6662(a), (b)(2).

FINDINGS OF FACT

The following facts are derived from the pleadings, three Stipulations of Facts with attached Exhibits, three Stipulations of Settled Issues, several trial Exhibits, and the testimony of fact and expert witnesses admitted into evidence at trial. HCLA is a Mississippi limited liability company classified as a TEFRA partnership for its taxable year ending December 31, 2016.[2] HCLA's principal place of business was in Georgia when the Petition was timely filed. Argive, its tax matters partner, also had its principal place of business in Georgia when the Petition

_____

[2] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit process for many partnerships, including HCLA.

**[\*4]** was timely filed.  Absent stipulation to the contrary, appeal of this case would lie to the U.S. Court of Appeals for the Eleventh Circuit.  *See* § 7482(b)(1)(E).

Petitioner called several fact witnesses who were acquaintances, business associates, or agents of the principal actors in the SCE transaction.  Other witnesses had invested in SCE deals and thus had a direct or indirect stake in the outcome of this case.  While generally showing good recall of many facts from 2015 and 2016, they sometimes expressed inability to recall certain facts about matters that might be regarded as unhelpful to petitioner's position.  Because of some witnesses' selective inability to recall pertinent facts, the Court has been required to make credibility determinations.

I.    *The Subject Property*

The conservation easement was granted on a 236-acre parcel of land in Hancock County, Mississippi (HCLA Parcel or Subject Property).  Hancock County lies in the southernmost portion of the state along the Louisiana border and the Gulf of Mexico.  Pearl River County abuts it on the north.

The Subject Property, marked "S" on the map below, is four miles southeast of Nicholson, Mississippi.  It sits inside a buffer zone surrounding the John C. Stennis Space Center, the Nation's largest rocket engine test facility (Stennis Buffer Zone).  The Stennis Buffer Zone is a 125,000-acre tract established in the 1960s by the National Aeronautical and Space Administration.  Given the hazards connected with rocket testing, residential dwellings and most commercial activities are prohibited inside the Stennis Buffer Zone by virtue of a perpetual easement held by the Federal Government.

[*5]



The Pearl River meanders south through Pearl River County and Hancock County and then into the Gulf of Mexico. Since time immemorial, massive amounts of sand, gravel, and clay have been deposited in the Mississippi River basin generally and near the Pearl River specifically. Although most commercial and industrial activity is prohibited inside the Stennis Buffer Zone, mining is allowed. Given the alluvial deposits beneath the surface and the restrictions against other uses, S&G mining is prevalent in Hancock County and neighboring counties. The map below shows how the Subject Property is situated among the active mines (indicated by dots) and inactive mines (indicated by stars) in the surrounding area.

[*6]



## II.    *Prior Ownership of the Subject Property*

The Subject Property was part of a 1,698-acre tract (Parent Tract) purchased in September 2003 by DK Aggregates, LLC (DK Aggregates). Murray Moran was the principal or sole owner of DK Aggregates.  He paid $1.52 million, or $895 per acre, for the Parent Tract, which at that point was undeveloped land.

Mr. Moran opened an S&G mine on a portion of the Parent Tract called the "south pit," which lies roughly 500 feet northwest of the Subject Property.  During 2004–2010 DK Aggregates mined construction S&G (commonly called "aggregates") from the south pit, using dredging machinery.  This type of mine is commonly called a "wet mine."  DK Aggregates also mined clay for use in rebuilding levees in the wake of Hurricane Katrina, which devastated New Orleans and the gulf coast in August 2005.

In August 2010 DK Aggregates filed a petition for chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Southern District of Mississippi.  In April 2012 the bankruptcy court approved sale of the

[*7] company's assets to Frac Diamond Aggregates, LLC (Frac Diamond), which the court found to have made "the highest and best offer for the Purchased Assets." The court ruled that the sale "must be approved and consummated promptly in order to preserve the viability of the business . . . as a going concern."

In May 2012 DK Aggregates and Frac Diamond executed a warranty deed to consummate the sale. The purchased assets included the 1,698-acre Parent Tract "together with all improvements thereon and all appurtenances in any wise appertaining thereto." Frac Diamond paid $12.7 million to acquire these assets.

The record contains no evidence indicating what portion of the $12.7 million purchase price was allocable to the land, as opposed to the hard assets (such as mining equipment) and intangible property (such as customer lists) owned by DK Aggregates. The hard assets transferred to Frac Diamond included all the machinery and equipment that DK Aggregates had used to operate the wet mine on the south pit of the Parent Tract. This machinery and equipment were in reasonably good operating condition but needed to be made "more robust," e.g., by replacing the screens used to sieve the dredged material into various grades of S&G. If one were to make the contrary-to-fact assumption that the entire $12.7 million was paid for the land, that would translate to a price of $7,479 per acre.

Frac Diamond was owned (in whole or large part) by Kevin Bowen and Jeff Bartlam. They secured (directly and through affiliated entities) a $30.8 million loan from institutional investors. Frac Diamond used this capital to expand the production capacity of the S&G mining operation and acquire additional equipment, including a more advanced drying facility to prepare the S&G for sale.

In 2013 Frac Diamond opened on the Parent Tract a second wet mine, which we will call the north pit. It lies above the south pit, roughly 1.5 miles from the Subject Property. The north pit began production in late 2013. The map below shows the location of the north pit, the south pit, and the Subject Property.

**[*8]**



While continuing production of construction aggregates, Frac Diamond intended to expand its product line to include "frac sand," a category of sand used by energy companies in hydraulic fracturing ("fracking") of oil and gas wells. Fracking is a process by which fluid, typically consisting of water and sand, is injected at extremely high pressure into geologic formations, enabling recovery of oil and natural gas that was previously unrecoverable. When the hydraulic pressure is removed from the well, the sand holds the fractures open to enable oil and gas to flow to the surface. Frac sand is sometimes called "proppant sand" because it keeps the fractures "propped open." Although this technology goes back many decades, a fracking boom exploded after 2000 when fracking was successfully applied on a commercial scale to shale deposits in the United States. This boom created significant new demand for frac sand and other proppants (including coated sand and man-made ceramic materials).

[*9]   To be marketed successfully, frac sand must meet specifications recommended by the American Petroleum Institute (API).  These specifications include standards relating to sieve size, sphericity, roundness, acid solubility, turbidity, and crush resistance.  To meet these standards the operator must employ advanced screening (sieving) methods, carefully purify the sand, and process the sand through a sophisticated drying facility.  In late 2012 Frac Diamond commenced construction of a new and larger drying facility in Picayune, Mississippi, about four miles north of the two wet mines.

In May 2013 Frac Diamond stopped paying interest on the $30.8 million loan and that failure continued through July 2013.  The institutional investors accelerated the due date of the loan, triggering a default.  At a nonjudicial foreclosure sale on October 1, 2013, the Parent Tract, including the two existing wet mines and all related equipment, was acquired by Mine Assets Holding, LLC (MAH).  MAH was a subsidiary of Shale Support Holdings, LLC (Shale Support), whose principals included Mr. Bowen, who served as its chief executive officer (CEO).  The purchase price was $4 million.  If one were to make the contrary-to-fact assumption that the entire $4 million was paid for the land, that would translate to a price of $2,356 per acre.

Petitioner did not explain at trial how the $4 million purchase price was allocated between the land and the mining equipment on the north and south pits.  However, the record contains a clue.  HCLA included Form 8283, Noncash Charitable Contributions, with its 2016 Form 1065.  On that Form it stated that the HCLA Parcel had been acquired in October 2013 by purchase and that its adjusted basis in the property was $165,551, or $701 per acre.  If we assume that MAH (HCLA's predecessor) treated all acreage in the Parent Tract as equally valuable, it would appear that it allocated $1,190,298 to the land (1,698 acres × $701) and that it allocated the balance of the $4 million purchase price, or $2,809,702, to the mining equipment.  This would indicate a 30% allocation to the land and a 70% allocation to the equipment.

In early 2015 Mr. Bowen caused MAH to sever 210 acres from the Parent Tract and convey a fee simple interest in that parcel to Atlantic Coast Conservancy (ACC), which would later be granted the conservation easement over the HCLA Parcel.  MAH and its principals claimed a charitable contribution tax deduction for the fee simple gift.  The record does not disclose the dollar amount of the deduction they claimed.

[*10] On March 12, 2015, Mr. Bowen caused MAH to transfer the balance of the Parent Tract to Wet Mine Assets Holdings, LLC (WMAH). This acreage included the two wet mines and the Subject Property. Shale Support was the sole member of WMAH. Thus, as of March 2015, Shale Support owned (through WMAH) the entirety of the S&G mining operation on the remainder of the Parent Tract, including the Subject Property, which remained vacant land.

At a time not disclosed by the record, Shale Support and its affiliates (collectively, Shale Support) secured a $60 million loan from Deutsche Bank. This capital was used to improve the wet mines, to complete construction of the drying facility in Picayune (apparently finished in 2014), and to begin construction of a railyard in Picayune to facilitate shipment of sand.

Shale Support began producing frac sand from the two wet mines in 2013, and its production increased during 2014 and 2015. Although Shale Support's principals testified that the operation was profitable, petitioner introduced no credible evidence to establish that fact. It produced no documentary evidence to establish the volumes of frac sand actually extracted and shipped during 2013, 2014, 2015, or 2016. It produced no financial statements from Shale Support, WMAH, or their affiliates to establish that the frac sand operation generated profits or (if it did) how large those profits were. And while Shale Support's principals asserted that the company attracted interest from prospective buyers, petitioner produced no documentary evidence to support those assertions, which consisted solely of testimony we did not find credible.

III.   *The Market for Frac Sand*

Because energy companies were the principal—virtually the sole—major customers for frac sand, the demand for that commodity was highly dependent on oil and gas prices and on the number of drilling rigs operating in the United States at any given time. The spot price for crude oil, which exceeded $100 a barrel for much of 2011–2013, began plummeting in August 2014 and hit a low of $28 per barrel in February 2016. Prices briefly rebounded to $50 per barrel but declined again to $39.50 per barrel as of the August 2016 valuation date.

Not surprisingly, the number of U.S. drill rigs in operation declined precipitously along with oil prices. As reported by Baker Hughes Co. (Baker Hughes) in its weekly updates, the total number of U.S. operating oil and gas drill rigs hovered near 2,000 during 2010–2013. The

[*11] rig count began to decline toward the end of 2014, then plummeted during the first quarter of 2015. It leveled off briefly, then resumed its decline through May 2016. As of May 2016, the total U.S. rig count was below 500—the lowest weekly total reported by Baker Hughes since it began publishing its census numbers in 1987. As noted by financial analysts at the time, this was not good news for S&G companies selling frac sand.

Owing in part to unpredictability in the energy markets, S&G producers in Hancock County and its environs were not uniformly enthusiastic about the prospects for frac sand. Huey Stockstill, an experienced miner, owned a 200-acre S&G property in Pearl River County and a 491-acre S&G property in Hancock County. The latter was about 1,500 feet south of the Subject Property. At both properties he mined construction sand and aggregates exclusively. After testing the sand on his properties, he concluded that "it was too angular and not preferred by frackers," who required sand meeting API specifications for roundness and sphericity. *See supra* p. 9.

Richard Burge, a major landholder in Hancock County, owned South Gate Aggregates (South Gate), located one mile west of the HCLA Parcel (as shown on the map *supra* p. 8). At South Gate, Mr. Burge mined S&G used in producing concrete and other aggregates, viewing the market for these products as "consistent." He chose not to mine frac sand, not only because of market uncertainties, but also because he regarded it as "very expensive." Production of frac sand, he explained, required bigger dredges, more expensive wet mine equipment, and a costly drying facility. As he put it, producing frac sand requires "going from a gravel pit to a factory."

IV.    *Historical Prices for S&G Property*

We heard testimony at trial from several experienced miners who had bought and sold S&G property in Hancock County and Pearl River County, its neighbor to the north. Mass ("Tinker") Blackwell has 30+ years of experience mining S&G in Hancock County. He worked for several years for (and for a time was part owner of) DK Aggregates, which originally mined the south pit on the Parent Tract. After it filed for bankruptcy, he focused his efforts on the wet mine he owned near Nicholson (Nicholson pit). The Nicholson pit was on a 500-acre parcel about a mile north of the Parent Tract.

[*12]  Mr. Blackwell credibly testified that the Nicholson pit contained basically the same quality of S&G as the DK Aggregates south pit.  He believed that the sand he mined from the Nicholson pit "met . . . frac sand spec[ifications]," but he could not market it as proppant sand because it was not "dry frac sand."  He sold the 500-acre tract in 2016 for $4 million, or $8,000 per acre.

Mr. Stockstill, mentioned previously, conducted his mining operations through Hutchinson Island Mining Corp. (Hutchinson).  It mined (and continues to mine) a 200-acre S&G property in Pearl River County.  As best Mr. Stockstill could remember, Hutchinson had acquired that property (at a time not disclosed by the record) for $4,000 to $5,000 per acre.

In September 2012 Hutchinson purchased a 491-acre tract in Hancock County that included an operating S&G mine.  This tract was roughly 1,500 feet south of the Subject Property.  Mr. Stockstill paid $1 million for the tract, allocating $850,000 to the land and $150,000 to the equipment.  He thus acquired the land for about $1,730 per acre.

Hutchinson mined S&G on the property for six years.  In February 2018 it sold the property (plus an adjoining 35 acres) to the U.S. Navy for $6.47 million, or $12,286 per acre.  Although Mr. Stockstill faced the prospect of a possible eminent domain proceeding, this prospect was not his sole motivation for accepting the Navy's offer.  He explained that he and his family wanted to sell the business and that they regarded the Navy's offer as reasonable.

Mr. Burge, the owner of South Gate, had a more protracted experience with the U.S. Navy.  He owned a 573-acre forested tract in Hancock County that test results showed to have significant S&G potential.  In 2003 the Navy informed him that it intended to take the land for use as a Navy training facility.  The negotiations lasted 15 years, with each side commissioning additional drill tests and securing revised appraisals.  After a series of increased offers from the Navy and approval by Congress in December 2018, he ultimately accepted $8.1 million, or $14,128 per acre, for the property.

**[\*13]** V.    *Enter Webb Creek*

Webb Creek Capital Management Group, LLC (Webb Creek), was a promoter of SCE transactions.[3]  Bryan Kelley was its CEO.  Webb Creek began promoting SCE transactions in 2012.

Mr. Bowen, on behalf of Shale Support, had retained Webb Creek in 2015 to plan an SCE offering using the Subject Property.  However, they discovered that subsurface oil and gas rights had been severed from the property and were held by another party.  This complicated their ability to satisfy the requirement that the conservation purpose be "protected in perpetuity."  *See* § 170(h)(5)(A).  Shale Support eventually solved this problem by securing a legal opinion that exercise of the oil and gas rights was a possibility "so remote as to be negligible."  *See* Treas. Reg. § 1.170A-14(g)(3).  But this opinion was not secured until April 2016.

On March 30, 2016, Mr. Kelley sent a letter of intent to Mr. Bowen setting forth the terms on which Webb Creek would assist Shale Support with an SCE transaction in 2016, with June 30 as the expected closing date.  Mr. Kelley noted that Mr. Bowen would be "familiar with this drill from the similar project that was done on your property in 2015."

Webb Creek agreed to "provide access to a range of experts, including . . . qualified appraisers, engineers, site developers, accountants, broker-dealers and attorneys," as well as a "clientele and investor base [that] extends throughout the United States."  Mr. Kelley stated that "we will utilize existing relationships of Webb Creek to prepare a private placement securities offering of membership units in an entity that we will form for the purposes of raising outside investor funds to acquire a majority interest in a property-owner entity, Hancock County Land Acquisitions, LLC (HCLA)."  The parties agreed that "Webb Creek will act as the manager of both the investment vehicle entity and HCLA."

Mr. Kelley noted the parties' expectation "that one investor group has interest in purchasing all or a substantial portion of the [SCE] offering."  The investor group consisted of clients served by the Argos Family Office, which provided wealth-management services to high-net-worth

---

[3] "Promoter" is sometimes viewed as a loaded term in the tax world because of the penalty imposed by section 6700(a) for "[p]romoting abusive tax shelters."  In this Opinion we use the term "promoter" in its ordinary sense, making no determination as to whether the activities of Webb Creek or its principals would subject them to a civil penalty under section 6700(a), a question that is not before us.

**[*14]** individuals. According to Mr. Kelley, the investor group "ha[d] agreed to remit certain up-front costs associated with this offering in the amount of approximately $200,000."

The letter of intent expressed the parties' understanding that "Webb Creek's management fee for this project will be no greater than 12% of the cash raised from the private placement securities offering, and not less than $250,000." (Webb Creek was ultimately paid a fee of $2.5 million, or 10.7% of the cash raised. *See infra* p. 37.) Webb Creek was also to receive, during 2017–2021, management fees of "up to $50,000 per year, which fees shall be paid out of the net offering proceeds from the securities offering." The letter did not explicitly state what Shale Support would be paid for the land. But Mr. Kelley noted that "[t]he parties have discussed approximate figures with respect to this transaction and agree to work together in good faith to arrive at a mutually beneficial and agreeable flow of funds."

VI.    *The Conservation Easement Transaction*

Webb Creek recommended an ownership structure that is common to many SCE transactions. A property company or PropCo would be formed, and Shale Support would transfer the Subject Property to the PropCo in exchange for partnership units in it. An investment company or InvestCo would be formed to raise funds from investors and use that money to purchase the PropCo units held by Shale Support. PropCo, now owned largely by InvestCo, would donate a conservation easement on the property. The investors would then receive, through InvestCo, pro rata shares of the tax deduction that PropCo claimed for the easement.

On March 17, 2016, Webb Creek formed Argive to serve as the InvestCo. On April 28 Webb Creek formed HCLA to serve as the PropCo. On May 16 Claud Clark III confirmed his engagement to prepare an appraisal of the planned conservation easement. On May 24 John T. Boyd Co. finalized a mineral evaluation report for the HCLA Parcel (Boyd report). It hypothesized the creation of an S&G mining business on the property and asserted that "the going concern value of the [hypothetical] HCLA operation as of May 1, 2016, is approximately $169 million." On June 6 Mr. Clark furnished a draft appraisal valuing the proposed easement at $180,177,000, using a methodology that discounted to present value the future cashflows that supposedly could be derived from the hypothetical mining business.

**[*15]** Like most SCE transactions, the deal was marketed to investors using a deduction-to-investment ratio. For the HCLA deal, investors were offered a ratio of 7.477:1. They were thus promised a charitable contribution deduction of $7.477 for every dollar invested.

On June 8, 2016, Webb Creek circulated a confidential Private Placement Memorandum (PPM) offering to sell 97 units (representing a 97% interest) in Argive (the InvestCo) for $23,374,575. The other three units of Argive were retained by Shale Support and Webb Creek. The offering was thus priced at $240,975 per unit ($240,975 × 97 = $23,374,575).

The promoters determined the offering price per unit by taking the aggregate amount of the promised tax deductions ($180,177,000, the easement value hypothesized by Mr. Clark), dividing that amount by the deduction-to-investment ratio (7.477), and dividing that amount by the total number of units (100). That is: ($180,177,000 ÷ 7.477) ÷ 100 = $240,975. The PPM acknowledged that the offering price of $240,975 per unit "does not bear any relationship to [Argive's] assets [or] book value" and was not "an indication of the value of HCLA or the Property."

The PPM explained that Argive would use the funds thus raised to purchase a 97% interest in HCLA, the PropCo. (The other 3% of HCLA would be held by a Webb Creek affiliate.) Argive's manager would then ask investors whether it should place a conservation easement on the HCLA Parcel (the "conservation proposal"), operate the property as an S&G mine (the "mining proposal"), or hold it for future sale or development (the "investment proposal"). Assuming that investors voted for the conservation proposal—as if there were any doubt about this—investors would be allocated a charitable contribution tax deduction of $1,801,770 for each unit acquired ($240,975 × 7.477 = $1,801,770).

The PPM disclosed that WMAH, to which Shale Support had transferred the HCLA Parcel, would be paid $18,247,575 for the 97 PropCo units it owned. That price was negotiated between attorneys and advisers representing Shale Support, the seller, and attorneys and advisers representing Webb Creek, the promoter. These negotiations are referenced in a series of emails between March 21 and June 7, 2016. The latter date was the day *after* Mr. Clark supplied his $180 million appraisal and the day *before* the PPM was circulated.

[*16] Brian Bojo, who represented Webb Creek, stated in a June 6 email that "Webb Creek's proposal was to provide 76%–77% of the cash raise [from the investor offering] to the Seller [i.e., WMAH]." In that email Mr. Bojo proposed "net cash to seller of $17,772,575, which is 76.03% of the projected cash raise of $23,374,575."

In an email reply on June 7, Shale Support's attorney acknowledged that Webb Creek's 76%–77% proposal had appeared in a March 21, 2016, email. But that earlier email had stated only that the parties were "getting close." For their part, Shale Support's representatives had proposed a formula under which WMAH would be paid 10.3% of the appraised value of the easement. Under that formula and using Mr. Clark's $180 million appraisal, WMAH would receive $18,540,000 from the proceeds of the investor offering ($180 million × 0.103 = $18,540,000).

The record does not reveal how Shale Support and Webb Creek bridged the $767,425 gap between their respective positions ($18,540,000 − $17,772,575 = $767,425). The amount on which they agreed, $18,247,575, was included in the PPM circulated the next day. That figure corresponds to roughly 78% of the $23,374,575 projected capital raise.

On June 15, 2016, WMAH transferred the HCLA Parcel to HCLA in exchange for a 98% ownership interest in it. The investor offering closed on June 17, 2016, and it was fully subscribed. As anticipated, most of the units offered for sale were purchased by clients of the Argos Family Office. For that reason, Webb Creek did not need to retain a broker-dealer to solicit customers for the offering. WMAH retained a 1% ownership interest in HCLA, and Argive paid WMAH $18,247,575 for the remaining 97 units.

As far as the record reveals, all the investors voted for (or were deemed to have voted for) the "conservation proposal." Petitioner adduced no evidence to the contrary. We find here, as we have found in previous cases, that selection of the conservation option was a foregone conclusion and that the other options were mere window-dressing designed to obscure the tax-shelter nature of the transaction. *See N. Donald LA Prop., LLC v. Commissioner*, T.C. Memo. 2026-19, at *23; *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at *38–39, *aff'd*, 158 F.4th 715 (6th Cir. 2025); *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at *28, *supplemented by* T.C. Memo. 2024-73.

[*17] Argive elected to devote a portion of the capital raise to purchase a "[section] 170(h) tax risk insurance policy" from Alliant Insurance Services, Inc. (Alliant). According to Mr. Kelley, this policy was intended to pay out if, "for any reason, the deduction was disallowed, and the members [of Argive] would sustain a loss." He said the partnership paid for this policy because "most investors wanted it" and "it made them feel good." Petitioner submitted a copy of an invoice from Alliant, but petitioner failed to introduce into the record a copy of the actual insurance policy. Argive paid a premium of $1,688,944 to Alliant.[4]

Petitioner elicited trial testimony from Paul Tice, a principal of the Argos Group, which offered family office services to the investor group. He also invested $216,878 personally in the SCE offering. When questioned about the "due diligence" performed in connection with the offering, Mr. Tice credibly testified that he reviewed the offering materials (including Mr. Clark's appraisal and the Boyd report) and participated in one telephone call with representatives of Shale Support and Webb Creek. He stated that his chief objective was to determine whether the hypothetical mining operation presupposed by the appraisal was "a viable option" or "a doable thing."

Mr. Tice credibly testified that he had no input into the $18,247,575 price that Argive agreed to pay WMAH for its PropCo units. He explained that this figure was "agreed to between the syndicator, Webb Creek, and the people selling the ground [Shale Support]." He stated, in effect, that "this was all he knew about the price" paid for the land.

On August 2, 2016, HCLA granted a conservation easement on the property to ACC, a "qualified organization" within the meaning of section 170(h)(1)(B) and (3). The easement was recorded the next day.

VII. *Tax Return and IRS Examination*

HCLA attached to its 2016 return an appraisal by Mr. Clark, dated August 10, 2016, that valued the easement as of July 18, 2016. This appraisal was substantially similar to the appraisal prepared on June 6, 2016, except that he corrected a math error. Subtracting from the property's assumed "before value" ($180,354,000) its assumed "after value" ($177,000), Mr. Clark determined a value of $180,177,000 for the

---

[4] Webb Creek paid an additional $20,000 to Alliant by check, but the record does not reveal the purpose for that payment. Petitioner has conceded the nondeductibility of this $20,000 payment, and we discuss it no further.

[*18] easement.  HCLA claimed a deduction for the easement in that amount.

On its return HCLA also claimed business expense deductions under section 162 that totaled $6,128,493.  Some of these were reported as "other deductions" on line 20 of Form 1065, and the balance were reported on line 13d of Schedule K, Partners' Distributive Share Items.  Those deductions were as follows:

| Item | Where Reported | Amount |
| --- | --- | --- |
| Bank charges | Form 1065 line 20 | $415 |
| Insurance expense | Form 1065 line 20 | 1,709,856 |
| Office expenses | Form 1065 line 20 | 111 |
| Postage | Form 1065 line 20 | 210 |
| Registration fee | Form 1065 line 20 | 1,650 |
| Appraisal fees | Sched. K line 13d | 38,698 |
| Legal/professional fees | Sched. K line 13d | 1,877,553 |
| Management fees | Sched. K line 13d | 2,500,000 |
| **TOTAL** | | **$6,128,493** |

On July 23, 2020, the IRS issued petitioner a Notice of Final Partnership Administrative Adjustment (FPAA) disallowing in their entirety all deductions claimed.  The FPAA determined that HCLA had not established that it had made a contribution or gift in 2016 and had otherwise failed to show that it had satisfied all the requirements of section 170.  The FPAA alternatively determined that, if HCLA had complied with applicable regulatory requirements, it had failed to establish that the value of the easement exceeded zero.  The IRS determined that HCLA had failed to establish that the other deductions claimed were "ordinary and necessary in the conduct of a trade or business as required under I.R.C. § 162."  The FPAA determined a 40% penalty for gross valuation misstatement with respect to the portion of the underpayment attributable to the disallowed charitable contribution deduction and a 20% penalty with respect to the portion attributable to the disallowed business expense deductions.

VIII.  *Tax Court Proceedings*

Argive timely petitioned for readjustment of partnership items.  The parties filed Stipulations of Settled Issues that resolved all issues in this case except three:  (1) the valuation of the conservation easement;

**[\*19]** (2) HCLA's entitlement to business expense deductions; and (3) HCLA's liability for penalties. Petitioner conceded that Webb Creek's management fee ($2.5 million) and the registration fee ($1,650) were nondeductible capital expenses related to the investor offering. Respondent conceded $5,825 of miscellaneous deductions, and petitioner made additional concessions in its Posttrial Briefs. *See infra* p. 39. In an opinion served May 20, 2025, we held that the IRS secured timely supervisory approval, as required by section 6751(b)(1), for the penalties determined in the FPAA. *See Hancock Cnty. Land Acquisitions, LLC v. Commissioner*, T.C. Memo. 2025-50, at \*5–11.

We tried the case in Atlanta, Georgia, in September 2025. Mr. Clark did not testify, and petitioner did not offer into evidence any opening expert reports. Respondent offered two opening expert reports, and petitioner submitted two brief rebuttal reports.

A. *Respondent's Experts*

1. *Alan Stagg*

Alan Stagg is a professional geologist and a certified mineral appraiser with 61 years' experience in the mining and petroleum industries. His experience includes resource and reserve estimating and assessment, mine planning, and mineral valuation. He has conducted these activities across a broad spectrum of the mining industry, including coal, oil, gas, precious and base metals, and industrial rocks and minerals. He has worked on at least 25 projects involving frac sand. We recognized him as an expert in geology and mineral valuation.

Mr. Stagg explained that mineral assets are commonly evaluated under a classification system approved by the Society for Mining, Metallurgy, and Exploration (SME). An exploratory mineral property lies at the bottom of the SME evaluation scale. Next are "mineral resources," which are classified (in ascending order) as "inferred," "indicated," or "measured," depending on how much testing and sampling have been done. At the top of the scale lie "mineral reserves," which are classified as "probable" or (better yet) "proven." Mineral reserves constitute the economically minable part of an indicated or measured mineral resource, such that extraction can reasonably be justified.

Mr. Stagg opined that the S&G on the HCLA Parcel would properly be classified as an exploratory mineral property or an "inferred mineral resource," i.e., a mineral resource whose quantity and quality are estimated on the basis of limited geological evidence and sampling.

**[\*20]** As compared to a "proven mineral reserve," an "inferred mineral resource" inspires a relatively low level of geological confidence.

Proppant sand deposits, Mr. Stagg noted, are rarely uniform and can vary greatly over relatively short distances. Only 7 test holes were drilled on the HCLA Parcel—roughly one for every 33 acres—and the drillhole samples showed significant variations in the percentages of clay, gravel, sand, and well-graded sand (the most promising source for frac sand). Mr. Stagg concluded that this limited drilling did not yield "sufficient quality data points for the deposit to be able to prepare meaningful tonnage estimates by product quality and, by extension, to develop a credible mine plan." He accordingly opined that "the presence of economically producible proppant sand on the Subject Property had not been established and thus did not contribute significantly, if at all, to the FMV of the Subject Property at August 2, 2016."

### 2. *Jason Garner*

Mr. Garner has been a licensed commercial real estate appraiser in Mississippi for 20+ years. Formerly employed by the Mississippi Department of Transportation, he has completed thousands of appraisals during his career. Most of his work has involved property (including mineral property) in the coastal counties of Mississippi. He holds a MAI designation from the Appraisal Institute, and we recognized him as an expert in real estate appraisal.

Mr. Garner concluded that the highest and best use (HBU) of the HCLA Parcel, before placement of the easement, was recreation and agriculture, including timber harvesting. Acknowledging that there were "numerous surface mining operations in the vicinity," he noted that "the presence of similar operations nearby does not, in itself, confer legal permissibility" for mining on the HCLA Parcel. Although the property's current zoning classification would permit mining, numerous permits would be required, and "no [permit] applications or approvals were in place."

Because "nearly 60 percent of the Subject Property is occupied by a bald cypress swamp," Mr. Garner believed that a wetlands designation from the U.S. Army Corps of Engineers (USACE) would likely be required. He noted that any type of surface mining operation must be permitted by the Mississippi Department of Environmental Quality (MDEQ). Upon receipt of a permit application, MDEQ would be

[*21] required to notify USACE, the U.S. Fish and Wildlife Service, and the Mississippi Departments of Fisheries and Marine Resources.

Mr. Garner believed that the permitting process might be complicated because WMAH, during 2015 and 2016, had impermissibly discharged pollutants (dredging material from the north or south pit) into waters of the United States lying within the HCLA Parcel. Under a Consent Agreement with the U.S. Environmental Protection Agency, HCLA ultimately paid a fine of $14,000 for this violation.

To determine the "before value" of the HCLA Parcel, Mr. Garner used the sales comparison approach. He focused his search on transactions involving land within the Stennis Buffer Zone, since those properties were subject to the same limitations on development as the HCLA Parcel. He identified 29 transactions between 2006 and 2019 and chose 5 as offering what he believed to be the best comparables. One property was the site of an operating S&G mine; two properties were the sites of operating dirt mines; and two properties were purchased for possible use as dirt mines, although they had no permits in place.

The sale prices for Mr. Garner's five comparable transactions ranged from $1,731 per acre to $3,742 per acre. After making various adjustments, he determined a "before value" of $2,250 per acre for the HCLA Parcel, generating a rounded value of $530,000 for the 236 acres. Subtracting from that figure an "after value" of $175,000, he concluded a value of $355,000 for the conservation easement.

B.    *Petitioner's Experts*

1.    *Cindy House-Pearson*

Cindy House-Pearson has 48 years of experience with USACE, including 22 years in the Mobile, Alabama, District Regulatory Division. She retired as the chief of that Division in 2014 and now works for TTL, Inc., providing consulting services in the field of natural resources. We recognized her as a rebuttal expert with expertise in wetlands delineation and mining permitting.

Ms. House-Pearson directed her rebuttal chiefly to Mr. Garner's conclusion that mining was not a legally permissible use of the HCLA Parcel because none of the required permits had been applied for or secured. She believed it "reasonable to say that the USACE and MDEQ would have strongly considered permitting the Property because the

**[\*22]** USACE is required to make 'fair and equitable decisions' and consider the 'reasonable use' of private property."

## 2. *Douglas Kenny*

Petitioner retained Douglas Kenny as a rebuttal expert to perform a review of Mr. Garner's appraisal. Mr. Kenny graduated in 2010 from Georgia Institute of Technology with a B.S. degree in industrial engineering. He began appraisal work in 2011 and is now a certified appraiser in Mississippi and numerous other states. He holds a MAI designation, and we recognized him as an expert in real estate appraisal and appraisal review.

Mr. Kenny offered four main criticisms of the Garner report. First, he believed Mr. Garner could not accurately value the HCLA Parcel because he had no training or experience in geology or mining. Second, he faulted Mr. Garner for failing to employ the income approach to value the HCLA Parcel, hypothesizing that the property "has the potential to become income producing due to the subsurface minerals." Third, while acknowledging that Mr. Garner had selected "mineral-related comparable sales" of properties that were "either actively being mined or were purchased specifically for mining," Mr. Kenny regarded those sales as noncomparable. According to Mr. Kenny, "an accurate appraisal would require sales of properties with similar physical characteristics, mineral reserves, . . . mineral quality, and mineral quantity." Absent evidence that the HCLA Parcel and the properties selected by Mr. Garner had the same quality and quantity of subsurface minerals, Mr. Kenny asserted that the properties could not be deemed comparable. Finally, Mr. Kenny noted that the properties selected by Mr. Garner were currently being mined for (or were purchased for the mining of) construction sand, aggregates, clay, and fill dirt. By contrast, he posited that the HCLA Parcel held potential for producing frac sand, which commanded higher prices.

## OPINION

The IRS's determinations in a notice of deficiency or an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

**[\*23]** Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer "introduce[d] credible evidence with respect to [that] factual issue," § 7491(a)(1), and "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A). Petitioner has not satisfied these requirements with respect to any factual issue that has salience in deciding the questions presented. The burden of proof thus remains on petitioner.

I.    *Charitable Contribution Deduction*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If the taxpayer makes a gift of property other than money, the amount of the contribution is generally equal to the FMV of the property at the time of the gift. *See* Treas. Reg. § 1.170A-1(a), (c)(1). The regulations provide that the FMV of property for charitable contribution purposes is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* para. (c)(2). Valuation is not a precise science, and the FMV of property on a given date is a question of fact to be resolved on the basis of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

To support their positions regarding valuation the parties retained experts who testified at trial. We assess an expert's opinion in the light of his or her qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weigh them by examining the factors the experts considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment. *Parker*, 86 T.C. at 561. We may accept an expert's opinion in toto or accept aspects of his or her testimony that we find reliable. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts). And we may determine FMV from our own examination of the record evidence. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

"Market prices" typically do not exist for conservation easements. *See Symington v. Commissioner*, 87 T.C. 892, 895 (1986); *Excelsior*

[*24] *Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at *30. For that reason, courts usually value easements indirectly using a "before and after" approach, seeking to determine the reduction in property value attributable to the easement. *See* Treas. Reg. § 1.170A-14(h)(3)(i); *cf. Browning v. Commissioner*, 109 T.C. 303, 320–24 (1997). Under that approach, the value of the easement is deemed equal to the FMV of the real estate before the easement was granted ("before value"), minus the FMV of the real estate as encumbered by the easement ("after value").

### A. *"Before Value" of the HCLA Parcel*

#### 1. *Valuation Methods*

Courts typically consider one or more of three approaches to determine a property's FMV: (1) the market approach, (2) the income approach, and (3) an asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). In the case of vacant, unimproved land, the market approach—often called the "comparable sales" or "sales comparison" method—is "generally the most reliable method of valuation." *Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987) (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision)).

The comparable sales method determines FMV by considering the sale prices realized for similar properties sold in arm's-length transactions near in time to the valuation date. *See ibid.*; *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1 (1979). Because no two properties are ever identical, the appraiser must make adjustments to account for differences between the properties (e.g., parcel size and location) and terms of the respective transactions (e.g., proximity to valuation date and conditions of sale). *Wolfsen Land & Cattle Co.*, 72 T.C. at 19.

The income method determines FMV by discounting to present value the expected future cashflows from the property. *See, e.g., Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 327 (2013). Income-based methods are generally disfavored when valuing vacant land that has no income-producing history. *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 324–25 (2012), *supplementing* 131 T.C. 112 (2008), *aff'd in part, vacated in part and remanded*, 755 F.3d 236 (5th Cir. 2014).

**[\*25]** That is because the absence of a financial track record makes an income-based method inherently speculative and unreliable.

### 2.    *Highest and Best Use*

The choice of valuation method is influenced in part by the HBU of the subject property.  *See Mitchell v. United States*, 267 U.S. 341, 344–45 (1925); *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii).  A property's HBU is the most profitable, legally permissible use for which the property is adaptable and needed, or likely to be needed in the reasonably near future.  *Olson v. United States*, 292 U.S. 246, 255 (1934); *Symington*, 87 T.C. at 896–97.  In short, the proposed use must be (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive.  *See Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at \*52, *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sep. 2, 2025); Appraisal Institute, *The Appraisal of Real Estate* 277 (13th ed. 2008).

Because property owners have an economic incentive to put their land to its most productive use, a property's HBU is presumed to be its current use absent proof to the contrary.  *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962); *Mountanos v. Commissioner*, T.C. Memo. 2013-138, 105 T.C.M. (CCH) 1818, 1819, *supplemented by* T.C. Memo. 2014-38, *aff'd*, 651 F. App'x 592 (9th Cir. 2016).  To establish an HBU different from the current use, a taxpayer must demonstrate both the "closeness in time" and the "reasonable probability" of the proposed use.  *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985).  Our inquiry entails "an objective assessment of how immediate or remote the likelihood is that the property, absent the [conservation] restriction, would in fact be developed, as well as any effect from zoning . . . laws that already restrict the property's potential highest and best use."  Treas. Reg. § 1.170A-14(h)(3)(ii).

The HBU concept "is an element in the determination of fair market value."  *Boltar*, 136 T.C. at 336.  But it is simply one element.  It does not supersede or eliminate the most important prerequisite in determining FMV, namely, that "a hypothetical willing buyer would purchase the subject property for the indicated value."  *Ibid.*; *see Corning Place*, T.C. Memo. 2024-72, at \*41; Treas. Reg. § 1.170A-1(c)(2).

In the appraisal attached to HCLA's return, Mr. Clark opined that the HBU of the HCLA Parcel was "the mining and production of frac sand and construction gravel [and] sand."  But Mr. Clark did not

[*26] testify at trial, and petitioner adduced no affirmative expert testimony that addressed the HBU of the HCLA Parcel. Mr. Stagg, respondent's geological expert, disagreed with Mr. Clark's conclusion, opining that "the presence of economically producible proppant sand on the Subject Property had not been established and thus did not contribute significantly, if at all, to the fair market value of the Subject Property at August 2, 2016." Mr. Garner agreed with Mr. Stagg, concluding that the HBU of the HCLA Parcel before placement of the easement was not mining but was recreation and agriculture, including timber harvesting.

We agree with respondent's experts. Petitioner has not carried its burden to prove that construction of an S&G mining operation on the HCLA Parcel was the property's pre-easement HBU. We will assume arguendo that all required permits could have been secured. Although frac sand mining may have been a legally permissible use, four principal facts convince us that it was not a financially feasible use in August 2016.

First, the track record of S&G mining on the Parent Tract does not inspire confidence. DK Aggregates, which mined S&G from the south pit for nine years, filed for bankruptcy. Frac Diamond, which acquired the mining assets, opened a second extraction site on the north pit and began construction of an advanced drying facility in Picayune to process frac sand. But it defaulted on its debt within 18 months, and its assets were sold for a relative pittance. Frac Diamond had paid $12.7 million for the mining business and had put additional capital into it. But the price the business fetched from Shale Support at the foreclosure sale in October 2013 was only $4 million.

Second, petitioner offered no credible evidence that Shale Support earned a profit from its mining activity on the north and south pits. Although it began producing frac sand from the two wet mines in 2013, petitioner introduced no documentary evidence to establish the volumes of frac sand actually produced and shipped during 2013, 2014, 2015, or 2016. And petitioner produced no financial statements from Shale Support, WMAH, or their affiliates to establish that the frac sand operation generated a profit or (if it did) how large those profits were. If Shale Support could not wring a profit out of two established wet mines, it is unlikely that a new market entrant would regard frac sand mining as financially feasible on an undeveloped parcel that lay less than a half mile away.

[*27] Third, frac sand was in the midst of a bear market in August 2016. Because energy companies were the major customers, the demand for frac sand was dependent on oil and gas prices and on the number of operating U.S. drill rigs. The spot price for crude oil, which exceeded $100 a barrel for much of 2011–2013, had declined to $39.50 per barrel in August 2016. The number of operating drill rigs declined precipitously along with oil prices: After hovering near 2,000 during 2010–2013, the rig count plummeted during the first quarter of 2015. It leveled off briefly, then resumed its decline through May 2016. As of May 2016, the total U.S. rig count was below 500—the lowest weekly total reported by Baker Hughes since it began publishing its census numbers 30 years previously. As noted by financial analysts at the time, this was not good news for S&G companies selling frac sand.

Finally, if one were to believe the rosy prognoses for frac sand that Shale Support's principals offered at trial, we found it incomprehensible that Shale Support did not simply mine the HCLA Parcel itself. It had completed construction of a large drying facility in 2014. Its principals testified that this facility had excess capacity and that they needed additional supply of sand to process through it. If that were so, the opportunity presented itself on a silver platter—a 236-acre parcel that Shale Support already owned, less than a half mile from its existing mines. The fact that Shale Support's principals chose to pursue an SCE transaction instead convinces us that they themselves did not view frac sand mining as the HBU of the HCLA Parcel.

In sum, we reject Mr. Clark's conclusion, in the appraisal accompanying the Form 1065, that the HBU of the HCLA Parcel was "the mining and production of frac sand and construction gravel [and] sand." That said, we make one adjustment to Mr. Garner's HBU conclusion. The HCLA Parcel indisputably had minerals (S&G) underneath it, and those minerals might hold value for a patient buyer. We accordingly conclude that the parcel's HBU in August 2016 was for recreation, timber harvesting, agriculture, and possible future development as an exploratory mineral property.

3.   *Applicable Valuation Method*

In the appraisal attached to the Form 1065, Mr. Clark generated an $180 million valuation by employing what we have called the "owner-operator" version of the income approach, using a DCF methodology. *See Ranch Springs, LLC v. Commissioner*, 164 T.C. 93, 117 (2025). But Mr. Clark did not testify at trial, and petitioner adduced no affirmative

**[\*28]** expert testimony supporting that approach or any other version of the income method. In substance, the parties agree that the sales comparison approach should be used to determine the "before value" of the HCLA Parcel, while disagreeing about which transaction(s) should be selected as comparable.

The sales comparison approach "values property by comparing it to similar properties sold in arm's-length transactions around the valuation date." *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at \*36. This method is based on the "principle of substitution." It stands for the proposition that "the value of a property can be estimated at the cost of acquiring an equally desirable substitute." *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at \*51; *see Buckelew Farm*, T.C. Memo. 2024-52, at \*50 n.25, \*55 ("[T]he principle of substitution . . . stands for the proposition that a hypothetical buyer will not pay more for a given property when an alternative property is available for less."); *Estate of Rabe*, 34 T.C.M. (CCH) at 119 ("[A] prudent man will pay no more for a given property than he would for a similar property.").

"In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation.'" *Oconee Landing*, T.C. Memo. 2024-25, at \*67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24); *see United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979) ("Courts have consistently recognized that, in general, comparable sales constitute the best evidence of market value."). That is because "the market place is the best indicator of value, based on the conflicting interests of many buyers and sellers." *Estate of Spruill*, 88 T.C. at 1229 n.24 (quoting *Estate of Rabe*, 34 T.C.M. (CCH) at 119). This general rule applies with no less force when the unimproved property sought to be valued has potential for mineral extraction. *See Ranch Springs*, 164 T.C. at 144–45; *J L Mins., LLC v. Commissioner*, T.C. Memo. 2024-93, at \*58; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*38; *Savannah Shoals*, T.C. Memo. 2024-35, at \*35.[5]

---

[5] In his rebuttal report Mr. Kenny urged that, when a potential mining property is being valued, no sale can be deemed "comparable" unless the other property has been tested and shown to have the same quality and quantity of minerals as the subject property. We and other courts have repeatedly rejected that argument. *See, e.g.*, *United States v. Am. Pumice Co.*, 404 F.2d 336, 336 (9th Cir. 1968) (per curiam) (rejecting claim that mineral properties are rarely comparable because of differences in quantity and quality of minerals); *Ranch Springs*, 164 T.C. at 149; *J L Mins.*, T.C. Memo. 2024-93, at \*56 (rejecting contention that preliminary geology report rendered property too unique to permit its valuation under the comparable sales method).

**[*29]**                    a.    *Prior Transactions Involving the HCLA*
                                 *Parcel*

"The best evidence of a property's FMV is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *31; *see Estate of Spruill*, 88 T.C. at 1233 ("[T]he price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value . . . ."); *Estate of Newberger v. Commissioner*, T.C. Memo. 2015-246, 110 T.C.M. (CCH) 615, 616–17 (observing that no evidence is more probative of a donated property's FMV than its direct sale price). For example, in *Ranch Springs*, 164 T.C. at 134, we found that the most persuasive evidence of a property's FMV was its actual sale price 12 months before the contribution. *Accord, e.g.*, *J L Mins.*, T.C. Memo. 2024-93, at *55; *Corning Place*, T.C. Memo. 2024-72, at *28–29; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *31; *Buckelew Farm*, T.C. Memo. 2024-52, at *56.

The record here includes persuasive evidence of this sort. The HCLA Parcel was part of the 1,698-acre Parent Tract, which was bought and sold three times between 2003 and 2014. Although these prior transactions do not offer perfect comparables, they do suggest an order of magnitude that is light years away from the $763,462 per-acre value claimed on HCLA's 2016 return.

DK Aggregates purchased the Parent Tract for $895 per acre in September 2003. That was an arm's-length transaction. The entirety of the Parent Tract was then undeveloped land, as was the HCLA Parcel in August 2016. DK Aggregates purchased the Parent Tract for the purpose of opening an S&G mine, the same HBU that Mr. Clark supposed for the HCLA Parcel. But while similar in these respects, the 2003 transaction has reduced persuasiveness as a comparable because it occurred 13 years before the valuation date.

After DK Aggregates entered bankruptcy, Frac Diamond purchased the mining business as a going concern for $12.7 million in May 2012. Frac Diamond thereby acquired not only the 1,698-acre Parent Tract but also the intangible and tangible assets owned by the business, including the machinery and equipment DK Aggregates had used to operate the wet mine on the south pit. The record contains no evidence as to how the $12.7 million purchase price was allocated between the land and the mining equipment, which was in reasonably good operating condition. On the unlikely assumption that the equipment was worth zero,

[*30] however, the purchase price would translate to only $7,479 per acre. Because Frac Diamond purchased the business in a bankruptcy sale, this transaction is not a perfect comparable. But we regard $7,479 per acre—the maximum portion of the purchase price that could possibly be allocated to the land—as a guardrail in our analysis.

After Frac Diamond defaulted on its loan, Shale Support (through MAH) purchased the Parent Tract, including the two existing wet mines and all related equipment, for $4 million in October 2013. Petitioner did not explain how the $4 million purchase price was allocated between the land and the equipment. However, the Form 8283 included in HCLA's 2016 return stated that the HCLA Parcel had been acquired in October 2013 by purchase and that its adjusted basis in the property was $165,551. This suggests that HCLA allocated roughly 30% of the purchase price to the land and 70% to the equipment, and that its cost for the land was $701 per acre ($165,551 ÷ 236 = $701). *See supra* p. 9. Although this transaction was a foreclosure sale, we give it some weight in our analysis because it was an arm's-length transaction that occurred less than three years before the valuation date and because the buyer (Shale Support) was a knowledgeable and experienced mining company.

b.      *Other Transactions Involving S&G Property*

Apart from the three transactions involving the Parent Tract, the record includes evidence regarding seven other transactions involving S&G property in Hancock County and Pearl River County, its neighbor to the north. Mr. Blackwell, who once worked for DK Aggregates, owned the Nicholson pit, a wet mine about a mile north of the Parent Tract. He purchased the 500-acre tract on which the Nicholson pit was located at a time and price not disclosed by the record. He credibly testified that it contained basically the same quality of S&G as the DK Aggregates south pit. He sold the 500-acre tract in 2016 for $4 million, or $8,000 per acre.

Mr. Stockstill, who conducted his mining operations through Hutchinson, acquired a 200-acre S&G property in Pearl River County. As best Mr. Stockstill could remember, Hutchinson had acquired that property for $4,000 to $5,000 per acre. The record does not disclose when that transaction took place.

In September 2012 Hutchinson purchased a 491-acre tract in Hancock County that included an operating S&G mine. This tract was roughly 1,500 feet south of the HCLA Parcel. Mr. Stockstill paid $1

**[*31]** million for the tract, allocating $850,000 to the land and $150,000 to the equipment. He thus acquired the land for about $1,730 per acre.

Hutchinson actively mined the 491-acre tract for sand and aggregates for six years. In February 2018 it sold the property (plus an adjoining 35 acres) to the U.S. Navy for $6.47 million, or $12,286 per acre. That transaction occurred 19 months after the valuation date, and the price may have been influenced by the risk of an eminent domain proceeding.

Mr. Burge, who operated South Gate, owned a 573-acre forested tract in Hancock County that test results showed to have significant S&G potential. In 2003 the Navy informed him that it intended to take the land for use as a Navy training facility. The negotiations lasted 15 years, with each side commissioning additional drill tests and securing revised appraisals. After a series of increased offers from the Navy, he ultimately accepted $8.1 million, or $14,128 per acre, for the property.

In sum, the record establishes that S&G mining properties close to the HCLA Parcel sold for $1,731 to $8,000 per acre between September 2012 and 2016. If we expand the search to 2018, we find prices ranging from $12,000 to $14,000 per acre. In the latter two transactions the buyer was the U.S. Navy, and the prices it paid may indicate that land within the Stennis Buffer Zone had enhanced value for military use.

c.  *Mr. Garner's Analysis*

Employing the sales comparison approach, Mr. Garner focused his search on transactions involving land within the Stennis Buffer Zone, since those properties were subject to the same limitations on development as the HCLA Parcel. He identified 29 transactions between 2006 and 2019 and chose five as offering what he believed to be the best comparable sales. All five properties were in Hancock County:

- Comparable #1 was the September 2012 transaction (discussed above) in which Hutchinson purchased a 491-acre tract that included an operating S&G mine. Hutchinson paid $1 million for the business, allocating $850,000 to the land. It thus acquired the land for $1,731 per acre.

- Comparable #2 was a June 2011 transaction in which Fortress Clay, LLC, purchased a 241-acre tract that included an operating dirt pit. This property was roughly 12 miles east of the HCLA Parcel. At the time of the conveyance, roughly 60 acres had been

[*32] mined for clay and sand, and another 100 acres were suitable for future mining operations. The buyer paid $1.3 million for the property, of which $900,000 was allocated to the land. It thus acquired the land for $3,742 per acre.

- Comparable #3 was an October 2015 transaction in which a trucking company purchased a 41-acre tract for $102,975, or approximately $2,500 per acre. Like Comparable #2, this property was roughly 11 miles east of the HCLA Parcel. According to the realtor, the purchaser bought this property with the intention to open a dirt pit, though it was not approved or permitted at the time of the purchase.

- Comparable #4 was a May 2016 transaction in which an individual purchased a 24-acre tract for $48,700, or about $2,000 per acre. Like Comparables #2 and #3, this property was roughly 11 miles east of the HCLA Parcel. According to the broker, the land was purchased for use as a dirt pit, though no approvals were in place at the time of the purchase.

- Comparable #5 was an August 2014 transaction in which three individuals purchased a 40-acre property for $75,000, or $1,875 per acre. This property was roughly 13 miles southeast of the HCLA Parcel. The property had been used as a dirt pit for several years, but it was not an active pit at the time of sale. The buyers had no plans to reopen the pit in the near future, though there were reportedly materials remaining that could be extracted.

The sale prices for the five transactions selected by Mr. Garner ranged from $1,731 per acre to $3,742 per acre. After making various adjustments, he determined a "before value" of $2,250 per acre for the HCLA Parcel, generating a rounded value of $530,000 for the 236 acres.[6]

The properties selected by Mr. Garner were comparable to the HCLA Parcel in several respects. All were in Hancock County and within the Stennis Buffer Zone. One property had an operating S&G

---

[6] Petitioner faults Mr. Garner for omitting from his analysis the May 2012 transaction by which Frac Diamond acquired the assets of DK Aggregates for $12.7 million. But that was not a comparable sale of real estate; Frac Diamond acquired the business of DK Aggregates as a going concern, including all of its tangible and intangible assets. *See supra* pp. 6–7, 29–30. Because there was no way to determine what portion of the purchase price should be allocated to the land, Mr. Garner reasonably excluded this transaction.

**[\*33]** mine, two properties had operating dirt mines, and two properties had the potential for exploitation as dirt mines. They resembled the HCLA Parcel to the extent that its HBU included possible future development as an exploratory mineral property.

But these properties and the HCLA Parcel were dissimilar in other respects. Comparable #1 was the only property with an operating S&G mine, and that sale occurred 4 years before the valuation date. Mr. Garner excluded from his consideration the sale of the same property in 2018 for $6.47 million, or $12,286 per acre. *See supra* pp. 12, 31. Three of the properties (comprising 24, 40, and 41 acres, respectively) were much smaller than the HCLA Parcel and perhaps less well suited to mineral exploitation. Comparables #2 through #5 featured actual or potential dirt mines, as opposed to S&G mines. The latter properties were 11 to 12 miles east/southeast of the HCLA Parcel and were quite distant from the Pearl River basin, which had well-documented S&G resources.[7]

Evaluating all the evidence, we find the most comparable transaction to be the 2016 sale of the 500-acre tract on which the Nicholson S&G pit was located. Mr. Blackwell credibly testified that it contained basically the same quality of S&G as the south pit on the Parent Tract. He sold his 500-acre tract in 2016 for $4 million, or $8,000 per acre.

Given the paucity of fully comparable sales that occurred before August 2016, we also give weight to two transactions that closed after the valuation date.[8] The first was Hutchinson's sale of the Comparable #1 property in February 2018 for $6.47 million, or $12,286 per acre. The

---

[7] Seeking to differentiate the HCLA Parcel from neighboring properties, petitioner urges that it contained frac sand, which sold for a premium over ordinary construction sand. But most of that premium compensated the seller not for the raw material but for the high costs of production, including an expensive drying facility. As Mr. Burge, an experienced miner, explained, producing frac sand requires "going from a gravel pit to a factory." Virtually all the land surrounding the HCLA Parcel contained frac sand, but the owners of neighboring properties chose not to manufacture frac sand because of the high costs involved. *See supra* p. 11.

[8] We recently noted that "sales occurring within a reasonable time after the valuation date may be used so long as the relevant market conditions have not materially changed." *Lake Jordan Holdings, LLC v. Commissioner*, T.C. Memo. 2025-123, at \*45 (quoting *Paul-Adams Quarry Tr., LLC. v. Commissioner*, T.C. Memo. 2025-112, at \*82); *see Trout Ranch, LLC v. Commissioner*, 493 F. App'x 944, 952 (10th Cir. 2012) (noting that whether evidence of subsequent sales should factor into an appraisal "is not a categorical question of law but a simple question of relevance"), *aff'g* T.C. Memo. 2010-283; *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1044 (11th Cir. 1988) ("There is no absolute rule which precludes consideration of subsequent sales.").

[*34] second is Mr. Burge's sale of the 573-acre tract in December 2018 for $8.1 million, or $14,128 per acre. The buyer in each case was the U.S. Navy, and the seller in each case faced the threat of an eminent domain proceeding. Although the existence of that threat reduces the theoretical comparability of those sales, it usually tends to do so by reducing the sale price, as compared with the price that might be achieved in the open market. On the other hand, the U.S. Navy was not buying the land for its S&G potential, and both sales prices must be adjusted downward because they occurred two years after the valuation date.

Because petitioner offered no open-market real estate transactions as potential comparable sales, and because Mr. Garner excluded from his analysis three transactions we deem relevant, the Court must exercise its own judgment in determining the "before value" of the HCLA Parcel. Prior transactions involving the Parent Tract would suggest a very low value, likely in the range of $2,000 per acre. *See supra* pp. 29–30. The three transactions we find most comparable would suggest a higher value, in the range of $8,000 to $14,000 per acre. Using our best judgment based on the record as a whole, we find that the "before value" of the HCLA Parcel was $10,000 per acre, or $2.36 million.

d. *Petitioner's Arguments*

Petitioner seeks to derive a "before value" for the HCLA Parcel, not from comparable sales of land in Hancock County, but from transactions that immediately preceded the placement of the conservation easement. The "total capital raise" from the investor offering was $23,374,575, and roughly 78% of that amount (or $18,247,575) was paid to Shale Support, which owned the land through WMAH. Making adjustments to account for minority interests, petitioner contends that the "before value" of the land was at least $18,634,933, or $78,962 per acre.

The FMV of property for charitable contribution purposes is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 1.170A-1(c)(2). In advancing the argument set forth above, petitioner confronts three major problems. First, who is supposed as the "willing buyer" of the HCLA Parcel under petitioner's theory? Second, was that person armed with knowledge of all relevant facts, free of any conflict of interest, and negotiating at arm's length over the value of the land? And third, why would a knowledgeable person, acting at arm's length, pay $78,962 per acre for unproven mining property, when proven mining

**[\*35]** property in Hancock County could be purchased for $8,000 per acre or less?

In its Pretrial Memorandum and closing argument at trial, petitioner contended that the investor offering constituted the arm's-length transaction and that the investors were the "willing buyers." But the investors were not buying land. They were buying a 97% interest in Argive, which proposed to acquire a 97% interest in HCLA, to which the land was to be conveyed.

The price the investors paid, $23,374,575, had nothing to do with the FMV of the land. The promoters determined the aggregate offering price by dividing the promised tax deduction ($180,177,000) by the deduction-to-investment ratio (7.477), yielding $24,097,499. The "total capital raise" from selling 97 units was thus $23,374,575 ($24,097,499 × 0.97). The PPM acknowledged that the offering price paid by the investors "does not bear any relationship to [Argive's] assets [or] book value" and was not "an indication of the value of HCLA or the Property."

Petitioner called only one member of the investor group, Mr. Tice, as a witness at trial. When questioned about the "due diligence" performed in connection with the offering, Mr. Tice stated that his chief objective was to determine whether the mining operation hypothesized by Mr. Clark was "a viable option" or "a doable thing." He credibly testified that he had no input into the $18,247,575 price that Shale Support was paid for its PropCo units. He explained that this figure was "agreed to between the syndicator, Webb Creek, and the people selling the ground [Shale Support]." He said "[t]hat's all [he] knew about the price" paid for the land.

The investors, in short, were not purchasing land. In substance they were purchasing tax deductions, at a rate of $7,477 for every $1,000 invested. The investors did not negotiate about the purchase of the land; the offering was not priced by reference to the value of the land; and the amount the investors paid had nothing to do with the value of the land. Petitioner produced no credible evidence that the investors expressed any view about what percentage of the offering proceeds should be paid to the landowner under arm's-length standards. We find that the sole focus of their concern was the magnitude of the tax deduction. That

**[*36]** number would be the same regardless of how much Shale Support was paid for the land.[9]

Petitioner offers a different version of this argument in its Posttrial Brief. It there argues that the "willing buyer" was Argive—the InvestCo—and that Argive was negotiating with Shale Support on behalf of the investors. At that point, Argive was a paper entity controlled by Webb Creek. This prompts the question whether Webb Creek can properly be regarded as negotiating on the investors' behalf.

We think the answer to that question is "no." Webb Creek was the promoter of the SCE deal, and it thus occupied a position adverse to the investors. It wanted to sell units in Argive to them at the highest possible price, and they presumably wanted to pay the lowest possible price. The record shows that Webb Creek and Shale Support were "getting close" to agreement on an $18 million purchase price for the land in March 2016, three months before the PPM was circulated. Because it was unknown at that point who the investors would be, it is difficult to see how Webb Creek could have been negotiating as their agent.

Putting the investors aside, petitioner alternatively contends that Webb Creek was negotiating *on its own behalf* with Shale Support about how much the latter would be paid for the HCLA Parcel. But Shale Support and Webb Creek were not negotiating at arm's length about the FMV of the land. They were simply dividing up a $24 million pot of money they expected to raise from the investor offering.

---

[9] In prior cases, courts have reasoned that the purchase of (say) a 98% interest in a partnership whose only significant asset is land may be analogized to a purchase of the land itself. *See TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1368, 1371 n.23 (11th Cir. 2021); *Oconee Landing*, T.C. Memo. 2024-25, at *71. But "[t]he degree to which the purchase of an interest in a partnership whose sole asset is a piece of property *reflects the fair market value* of the property varies by situation." *Harman Road Prop., LLC v. Commissioner*, T.C. Memo. 2026-23, at *40 (emphasis added) (quoting *Lake Jordan Holdings*, T.C. Memo. 2025-123, at *40 n.18). Because the amount paid by the investors in an SCE offering is typically a small fraction of the "before value" claimed in the appraisal, the former usually constitutes strong evidence that the latter is inflated. And the amount paid by investors may supply, in conjunction with the sale prices paid for comparable properties, a "final piece of historical evidence as to the 'before value' of the Subject Property." *Oconee Landing*, T.C. Memo. 2024-25, at *71–72. But we have never held that the amount paid by investors in an SCE offering necessarily equates to the FMV of the land held by the PropCo. In this case, for the reasons discussed in the text, "we give no weight to [the investor] transactions." *See Harman Road Prop.*, T.C. Memo. 2026-23, at *40.

**[\*37]** Given the nature of the SCE transaction, Shale Support and Webb Creek were not truly adverse parties. They were allies seeking to close a deal that would raise outrageous sums from investors seeking tax deductions. Webb Creek had no economic reason to negotiate assiduously about the price paid for the land, because the investors, not it, were putting up the cash. Webb Creek's main concern was to ensure that the deal would close so that it would get its $2.5 million "management fee."

The record shows that a purchase price of roughly $18 million for the HCLA Parcel was baked into the transaction from the outset. In a March 16, 2016, email, Webb Creek proposed that Shale Support would be paid 76% to 77% of the "capital raise." This email was sent nine days *before* Webb Creek sent its initial letter of intent setting forth the terms on which it would assist Shale Support with the SCE transaction. Because the "capital raise" was expected to be roughly $24 million, Webb Creek was proposing that Shale Support be paid between $18.24 million and $18.48 million for the land. The email indicated that the parties were "getting close" to agreement on a price in that range.

Webb Creek and Shale Support made a few tweaks to the price on June 6 and 7, after receiving Mr. Clark's $180 million appraisal of the easement. Shale Support proposed that it be paid 10.3% of that sum, or $18.54 million. Webb Creek proposed that Shale Support be paid $17.77 million, calculated as 76.03% of $23,374,575, the revised expected "capital raise." The amount on which they agreed, $18,247,575, was included in the PPM circulated on June 8. That figure, corresponding to roughly 78% of the "capital raise," is virtually identical to the $18.24 million figure that Webb Creek had proposed back in March.

These facts show that Webb Creek and Shale Support were not negotiating at arm's length over the FMV of the HCLA Parcel. Rather, they were dividing up what was expected to be $24 million of cash supplied by investors. Webb Creek wanted $2.5 million as its "management fee." It was a foregone conclusion that Argive would pay $1.7 million for the tax loss insurance policy. Legal fees, appraisal fees, and other transaction costs were expected to be around $1.8 million. Subtracting the expected costs of closing the deal ($2.5 million + $1.7 million + $1.8 million = $6 million) from the expected cash proceeds ($24 million) left roughly $18 million as the remainder. Webb Creek and Shale Support agreed in March 2016—at the very outset, before Webb Creek had even sent its letter of intent—that Shale Support would get "the remainder," give or take a few hundred thousand dollars. Their "negotiation" had

**[\*38]** nothing to do with the FMV of the HCLA Parcel. It was simply a division of proceeds from an investor offering predicated on a grotesque overvaluation of the easement.[10]

Finally, no rational person, armed with knowledge of the Hancock County market and acting at arm's length, would have agreed to pay $78,962 per acre for the HCLA Parcel in mid-2016. Prior transactions involving the Parent Tract, from which the HCLA Parcel was carved, would have suggested a value of less than $2,000 per acre. *See supra* pp. 29–30. In September 2012 Hutchinson, an experienced mining company, purchased a 491-acre tract that included an operating S&G mine—about 1,500 feet from the HCLA Parcel—for $1,731 per acre. *See supra* pp. 12, 31. In 2016 Mr. Blackwell sold a 500-acre tract on which the Nicholson pit was located—roughly a mile from the Parent tract—for $8,000 per acre. *See supra* pp. 12, 30. By agreeing to pay $78,962 per acre for the HCLA Parcel, Webb Creek demonstrated that it was not acting at arm's length or that it was not "a willing buyer . . . having reasonable knowledge of relevant facts." *See* Treas. Reg. § 1.170A-1(c)(2).

In a very real sense, petitioner's argument begs the question. We are seeking to determine the FMV of the HCLA Parcel before placement of the easement. Petitioner seeks to derive that value from the $24 million investors paid for their interests in Argive. But that $24 million was predicated on Mr. Clark's appraisal, which asserted that the FMV of the HCLA Parcel before placement of the easement exceeded $180 million. That was a grotesque overvaluation. But for that grotesque overvaluation, the investors would not have paid $24 million, and Argive would not have had the wherewithal to pay Shale Support $18 million. In contending that the FMV of the HCLA Parcel before placement of the easement was $18,634,933, petitioner in effect assumes what it is trying to prove.

---

[10] This conclusion appears to be supported by the HCLA operating agreement, which shows WMAH as contributing to the partnership $9.8 million of real property. Technically speaking, that number makes no sense: It was neither HCLA's basis in the 236-acre parcel (which was $165,000 per its Form 8283) nor the claimed FMV of the property (the $18,247,575 it was eventually paid). Contemporaneous emails suggest that the $9.8 million figure was derived by offsetting, against the $18 million that WMAH expected to receive, expenses expected to be incurred in the SCE offering.

**[\*39]**  B.    *Value of the Easement*

The "before and after method" equates the value of a conservation easement to the diminution in value suffered by the property that is encumbered by the easement.  To calculate this amount we must subtract from the "before value" of the property—here, raw land—the "after value" of that same property.  We have determined that the "before value" of the HCLA Parcel on the date the easement was granted was $2,360,000.  Petitioner has stipulated that its "after value" was $177,000.  The value of the conservation easement was thus $2,183,000.

II.    *Other Deductions*

On its Form 1065 HCLA claimed business expense deductions under section 162 totaling $6,128,493.  *See supra* p. 18.  On August 22, 2025, the parties filed a Third Stipulation of Settled Issues making various concessions.  Respondent conceded deductions of $4,800 for accounting expenses, $914 for title expenses, and $111 for printing expenses.  We will also allow the deductions of $330 claimed for bank charges, $35 for postage, and $912 for general liability insurance coverage.  HCLA conceded the nondeductibility of the $2.5 million Webb Creek management fee and the $1,650 registration fee, and it made further concessions in its Posttrial Brief.  The following amounts appear to remain in dispute:

| *Item* | *Where Reported* | *In Dispute* |
|---|---|---|
| Insurance expense | Form 1065 line 20 | $1,688,944 |
| Appraisal fee | Sched. K line 13d | 25,000 |
| Legal/professional fees | Sched. K line 13d | 1,576,431 |
| **TOTAL** | | **$3,290,375** |

Section 162(a) generally allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."  Taxpayers have the burden of proof to substantiate any deductions claimed.  *INDOPCO, Inc. v. Commissioner*, 503 U.S. at 83–84.  Section 709(a) provides that "no deduction shall be allowed . . . to [a] partnership or to any partner for any amounts paid or incurred to organize a partnership."  The statute likewise disallows any deduction for syndication expenses, i.e., expenses incurred "to promote the sale of (or to sell) an interest in such partnership."  *Ibid.*

**[\*40]** A.  *Insurance Expense*

The largest expense HCLA reported was the $1,688,944 insurance premium paid to Alliant for the "section 170(h) tax risk insurance policy." According to Mr. Kelley, this policy was expected to pay out if, "for any reason, the deduction was disallowed, and the members [of Argive] would sustain a loss." Petitioner did not submit a copy of the actual insurance policy into evidence, so it is not possible for the Court to determine what (if any) other conditions—in addition to the IRS's disallowance of the charitable contribution deduction—may have affected Alliant's payment obligation under the policy.

In its Posttrial Brief petitioner contends that the insurance was necessary "to protect Hancock's business from risks, such as tax audits and challenges." The risk of an IRS audit, petitioner says, is "inherent in the conservation easement space." By protecting against this risk, petitioner insists that the insurance expense was an "ordinary and necessary expense" of Hancock's business.

We disagree. The policy was purchased by HCLA, a passthrough partnership that had (and could have) no tax liability of its own. The deduction attributable to the easement was passed through ratably to the investors who owned membership interests in Argive, and they claimed charitable contribution deductions on their individual income tax returns. The tax risk against which Alliant insured was thus a tax risk borne by the partners in their individual capacities.[11]

Mr. Kelley acknowledged as much when he testified that the Alliant policy was intended to pay out if, "for any reason, the deduction was disallowed, and the members [of Argive] would sustain a loss." The insurance "covered the members," he said, "because the deduction would flow through to the members." According to Mr. Kelley, the partnership purchased this policy because "most investors wanted it" and "it made them feel good." The insurance expense was incurred to protect the partners in their individual capacities against a tax loss. Because this

---

[11] Petitioner cannot plausibly analogize the Alliant policy to a directors and officers (D&O) insurance policy of the sort that business entities routinely maintain. D&O policies protect corporate officers from liability for acts they perform in their capacity as corporate officers. Because petitioner failed to submit a copy of the insurance policy into the record, there is no evidence that the Alliant policy provided insurance protection to anyone apart from the investor-partners in their individual capacities.

[*41] expense was not an "ordinary and necessary" expense of the partnership's business, it was not a deductible expense under section 162.[12]

### B.    *Appraisal Fee*

The $25,000 appraisal fee was one tranche of the $75,000 fee Mr. Clark charged for his appraisal services. It was paid for the final appraisal that HCLA attached to its 2016 Form 1065. This was an ordinary and necessary expense of HCLA, because the appraisal was legally required as a condition of claiming the charitable contribution tax deduction. *See* § 170(f)(11)(D) and (E). Respondent concedes that HCLA paid this expense, but he urges that a deduction should be denied because Mr. Clark was originally retained by Webb Creek, to which Mr. Clark directed his invoices. We reject this argument: HCLA was the beneficiary of the final appraisal, it paid the $25,000 fee, and the expense qualified for deduction under section 162.

### C.    *Legal/Professional Fees*

Of the deductions HCLA claimed for legal/professional services, $1,576,431 remains in dispute. We resolve these matters as follows:

• HCLA claimed a deduction of $325,000 for legal services rendered by Mr. Bojo and his colleagues at McRae, Stegall, Peek, Harman & Smith (MSP). Mr. Bojo represented Webb Creek, the promoter of the SCE transaction. He described his work for Webb Creek as a "general corporate engagement" that included organization of HCLA and Argive, work on the PPM circulated to investors, and review of appraisals. He testified that MSP would normally charge about $45,000 for this type of work, but that HCLA paid MSP $325,000, apparently as an expression of its gratitude.

We sustain disallowance of this deduction for three reasons. First, the services MSP performed were retained by and rendered to Webb Creek, not HCLA. Second, most of MSP's services appear to have constituted nondeductible organizational or syndication expenses of

---

[12] Respondent advanced an alternative argument against the deductibility of the Alliant insurance premium. Because the insurance was designed to reimburse partners in the event their deductions were disallowed, respondent contends that Argive in effect claimed an impermissible deduction for Federal income tax. *See* § 275(a)(1); *Mali v. Commissioner*, T.C. Memo. 2011-121, 101 T.C.M. (CCH) 1595, 1598. Because we sustain disallowance of the deduction for the reasons stated in the text, we need not reach respondent's alternative argument.

**[\*42]** HCLA and/or Argive. *See* Treas. Reg. § 1.709-2(a) (defining "organizational expenses" to include "fees for services incident to the organization of the partnership"); *id.* para. (b) (defining "syndication expenses" to include "legal fees . . . for securities advice and for advice pertaining to the adequacy of tax disclosures in the . . . placement memorandum"). Third, because HCLA paid $325,000 for services worth only $45,000, petitioner failed to prove that the outlay was a necessary expense of HCLA's business.

• HCLA claimed a deduction for $600,000 paid to CG Capital Markets (CGCM) for "consulting services related to Argos Partners," the family office that advised most of the investors in the SCE transaction. According to Mr. Kelley, CGCM had a prior relationship with the investors and was the entity that introduced them to Webb Creek. CGCM's invoice was addressed to Webb Creek and related to the "due diligence" CGCM allegedly performed regarding the transaction. The record includes no evidence (apart from the invoice) to establish the nature or extent of the work CGCM actually performed.

We sustain disallowance of this deduction for three reasons. First, HCLA was not the beneficiary of CGCM's services. The $600,000 appears to have been a "finder's fee" that Webb Creek paid CGCM for bringing investors to it. To the extent CGCM actually performed due diligence, those services were rendered to (and principally benefited) Argos Partners and its clients who invested in the SCE transaction. Second, to the extent HCLA were thought to benefit from these services, CGCM's fee constituted a nondeductible syndication expense, i.e., an expense "to promote the sale of (or to sell) an interest in such partnership." § 709(a). Third, the due diligence Argos performed (or caused to be performed) was apparently minimal. *See supra* p. 17. Petitioner submitted no credible evidence to prove that payment of $600,000 for CGCM's services was an "ordinary and necessary" expense of HCLA's business.

• HCLA claimed a deduction of $200,000 for "conservation easement structuring & consulting" services performed by Thornbriar Capital, LLC (Thornbriar). The invoice, dated November 28, 2016, was addressed to Webb Creek, the promoter. The record includes no evidence (apart from the invoice) to establish the nature or extent of the work Thornbriar performed.

We sustain disallowance of this deduction for two reasons. First, petitioner has failed to prove that the $200,000 outlay was an ordinary expense as opposed to a capital expenditure, e.g., an organizational

[*43] expense of Argive or HCLA or a syndication expense designed to promote the sale of interests in Argive. *See* 709(a); *Egolf v. Commissioner*, 87 T.C. 34, 42–43 (1986). Second, petitioner has adduced no evidence to show that $200,000 was a necessary expense, i.e., a reasonable amount to pay for whatever services Thornbriar in fact performed. *See Hopkins v. Commissioner*, T.C. Memo. 2005-49, 89 T.C.M. (CCH) 844, 848.

- HCLA claimed a deduction for $200,000 paid to INTI, LLC, for services described as follows: "Consulting: due diligence and marketing related to Southeastern Argive Investors, LLC." The invoice, dated July 7, 2016, was addressed to Webb Creek, the promoter. The record includes no evidence (apart from the invoice) to establish the nature or extent of the work INTI performed.

As with the amount paid to CGCM, we sustain disallowance of this deduction for two reasons. First, petitioner has failed to prove that the $200,000 outlay was an ordinary expense as opposed to a capital expenditure, e.g., an organizational expense of Argive or a syndication expense designed to promote sale of interests in Argive. *See* 709(a); *Egolf*, 87 T.C. at 42–43. To the extent INTI performed "marketing" for Argive, the fees for its services constituted a syndication expense; to the extent INTI performed "due diligence," its services were rendered to the investors or Argos Partners, not HCLA. Second, petitioner has adduced no evidence to show that $200,000 was a necessary expense, i.e., a reasonable amount to pay for whatever services INTI in fact performed. *See Hopkins*, 89 T.C.M. (CCH) at 848.

- HCLA claimed a $200,000 deduction for an amount paid to Citizens First Bank. In support of this deduction petitioner submitted a copy of a check for $200,000 bearing on its memo line the words "Contingency Reserve—Citizens." The record includes no evidence (apart from the words on the check itself) to establish what this amount was paid for.

We sustain disallowance of this deduction. Petitioner has failed to prove that the $200,000 was an expense (as opposed to a refundable deposit or similar item) or that this item (if an expense) was an ordinary and necessary expense of HCLA's business.

- HCLA claimed a deduction of $50,000 for amounts paid to Bowen & Associates (B&A) for a variety of accounting and related services. B&A prepared HCLA's 2016 Form 1065 (including the attached

[*44] Form 8283) and the 2016 tax return for Argive (including the Schedules K–1, Partner's Share of Income, Deductions, Credits, etc., for Argive's members). Randy Bowen, a partner in the firm, testified that B&A also reviewed the PPM, reviewed Mr. Clark's appraisal, and answered questions posed by prospective investors. Petitioner did not submit an invoice from B&A that delineated the specific amounts it charged for the various services it performed. Rather, petitioner described B&A's $50,000 fee as "all inclusive."

To the extent B&A's fee represented compensation for preparing HCLA's Form 1065, that fee would be a deductible expense. But B&A also performed tax preparation services for Argive and its investors. And to the extent B&A spent time reviewing the PPM, reviewing the appraisal, and answering investors' questions, its fees likely constituted nondeductible syndication expenses. *See* 709(a); *Kimmelman v. Commissioner*, 72 T.C. 294, 306 (1979) (holding that fees charged for advertising, circulating prospectuses, and promoting an investment were nondeductible syndication expenses).

If a taxpayer proves that a deductible expense was incurred but cannot establish the precise amount, the Court in appropriate circumstances may estimate the allowable deduction. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). But there must be sufficient evidence in the record to supply a rational basis for such an estimate. *See Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985); *see also Lerch v. Commissioner*, 877 F.2d 624, 627–29 (7th Cir. 1989) (refusing to apply the *Cohan* rule where the taxpayer failed to present evidence to support a reasonable estimate), *aff'g* T.C. Memo. 1987-295. Petitioner has failed to supply any basis on which we can estimate the portion of B&A's $50,000 fee that was allocable to preparation of HCLA's Form 1065. We thus have no alternative but to deny the deduction in toto.

• HCLA claimed a deduction of $1,281 for services performed by TSI Title Services, LLC (TSI), as shown in an invoice dated April 27, 2016. This invoice reflected charges for a title opinion rendered to "Wet Mine Assets, LLC," the original owner of the HCLA parcel. The invoice was directed to the MSP law firm, which represented Webb Creek, the promoter. Petitioner submitted no evidence that the title services benefited HCLA (as opposed to Shale Support, which owned WMAH). We will accordingly sustain disallowance of this deduction.

• HCLA claimed a deduction of $1,064 for additional title services performed by TSI, as shown in an invoice dated August 2, 2016.

**[\*45]** Respondent conceded $914 of this amount but disputes a $150 charge billed as a "recording fee for conservation easement." We will allow the $1,064 deduction in full.

III.   *Penalties*

The Code imposes a penalty applicable to "the portion of any underpayment [of tax] which is attributable to . . . [a]ny substantial valuation misstatement[]." § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." § 6662(h). A misstatement is "gross" if the value of property claimed on the return exceeds 200% of the correct amount. § 6662(h)(2)(A)(i).

The value HCLA claimed for the easement on its 2016 return was $180,177,000. We have determined that the FMV of the easement was only $2,183,000. The claimed value thus exceeded the correct value by $177,994,000—substantially more than 200%. The valuation misstatement was thus "gross."

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property. *See* § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See* § 6664(c)(3) (first sentence). The 40% penalty thus applies to the portion of HCLA's underpayment attributable to claiming a value for the easement in excess of $2,183,000.

Respondent also seeks a 20% penalty for an underpayment due to negligence or a substantial understatement of income tax. *See* § 6662(a) and (b)(1) and (2). This penalty would apply to the portion of any underpayment not attributable to the valuation misstatement. *See Oconee Landing*, T.C. Memo. 2024-25, at \*75 (citing *Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, 122 T.C.M. (CCH) 343, 343). Because HCLA is entitled to a charitable contribution deduction of $2,183,000, there could be no underpayment attributable to claiming a deduction in that amount. We thus consider the applicability of the 20% penalty to the portion of the underpayment resulting from our

**[\*46]** conclusion that most of the deductions HCLA claimed under section 162 must be disallowed.[13]

The 20% penalty applies to the portion of an underpayment attributable to negligence or disregard of rules or regulations. § 6662(a) and (b)(1). The existence of negligence is determined at the partnership level. *See Oakbrook Land Holdings, LLC v. Commissioner*, T.C. Memo. 2020-54, 119 T.C.M. (CCH) 1351, 1360; Treas. Reg. § 301.6221-1(c). Negligence includes any failure "to keep adequate books and records or to substantiate items properly." Treas. Reg. § 1.6662-3(b)(1).

The "reasonable cause" defense may be asserted against the negligence and substantial understatement penalties. The determination of reasonable cause is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). The partnership bears the burden of proving that it had reasonable cause and acted in good faith. *See Higbee v. Commissioner*, 116 T.C. 438, 449 (2001).

HCLA had no plausible basis for claiming most of the deductions at issue. Many of the expenses were incurred by (or for the benefit of) parties other than HCLA, e.g., Webb Creek, WMAH, Argos Partners, or the Argive investors in their individual capacities. Many of the expenses constituted syndication or partnership organizational expenses, which are plainly nondeductible. HCLA failed to secure and keep records to establish the nature, extent, and value of the professional services rendered, which is prima facie evidence of negligence. *See* Treas. Reg. § 1.6662-3(b)(1). In short, petitioner offered no plausible evidence that HCLA had reason to believe it was entitled to the disallowed deductions or that its managers "exercised ordinary business care and prudence" in taking those tax positions. *See Crimi v. Commissioner*, T.C. Memo. 2013-51, 105 T.C.M. (CCH) 1330, 1353.

HCLA asserts reliance on professional advice as the basis for a "reasonable cause" defense. *See* Treas. Reg. § 1.6664-4(b)(1). Reliance on professional advice will absolve a taxpayer only if it establishes that it fully disclosed all relevant facts to the return preparer, that the errors

---

[13] The determination of an "underpayment" within the meaning of section 6662(a) cannot be made at the partnership level because partnerships do not pay tax. *Plateau Holdings*, 122 T.C.M. (CCH) at 343. However, we can determine at the partnership level *the applicability* of the penalty. *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 233 (2018); *Oconee Landing*, T.C. Memo. 2024-25, at \*75; *Plateau Holdings*, 122 T.C.M. (CCH) at 343.

[*47] on the return were a result of the preparer's mistakes, and that it actually relied on the preparer's advice in good faith. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *Estate of Goldman v. Commissioner*, 112 T.C. 317, 324 (1999), *aff'd sub nom. Schutter v. Commissioner*, 242 F.3d 390 (10th Cir. 2000) (unpublished table decision).

HCLA's Form 1065 was prepared by Randy Bowen, an accountant at B&A. Randy Bowen invested $24,098 in the SCE transaction and was allocated a tax deduction of roughly $175,000. Apart from preparing HCLA's Form 1065, he and his firm reviewed the PPM, reviewed Mr. Clark's appraisal, and answered questions posed by prospective investors. Because Mr. Bowen invested in and helped market the SCE transaction, he was not an adviser whom HCLA could plausibly regard as neutral and objective. *See Neonatology Assocs.*, 115 T.C. at 98.

The only documents Mr. Bowen was given for use in preparing HCLA's Form 1065 were its income statement, trial balance, and general ledger. As far as the record reveals, he simply took the expense numbers that HCLA gave him and put those numbers on the return. There is no evidence that he affirmatively advised HCLA that any item was a legitimate business expense, was adequately substantiated, was reasonable in amount, or constituted an "ordinary and necessary" expense (as opposed to a nondeductible organizational expense, syndication cost, or other capital expenditure). And there is no evidence that HCLA disclosed to Mr. Bowen all relevant facts about the expense items in question. We accordingly reject petitioner's reliance-on-professional-advice defense with respect to the disallowed business expense deductions.

We have considered all the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*Decision will be entered under Rule 155.*